**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE CELLULAR TELEPHONE SEIZED ON JANUARY 23, 2024 | No. 2:24-mj-76-KFW<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, David McGuckin, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA") having served in this capacity for approximately 18 years, both from August 2004 to April 2019, and from March 2021 to the present. I am currently assigned to the DEA's Manchester District Office, High Intensity Drug Task Force One in Bedford, New Hampshire, where my primary duties include investigating federal drug crimes. For approximately 23 months, from April 2019 to March 2021, I was employed as an Inspector with the United States Postal Inspection Service ("USPIS"). While employed with the USPIS, I was assigned to the Boston Division, Prohibitive Mail Team, where my primary duties included investigating federal crimes involving the U.S. Mail, such as federal drug crimes. I hold a Bachelor of Science degree from the University of New Hampshire in Durham, New Hampshire and a Master of Science in Education degree from Iona University in New Rochelle, New York.

2. Over the course of my law enforcement career, I have been trained in all major aspects of drug-related investigations. In 1998, I graduated from the DEA Training Academy in Quantico, Virginia, where I received training in drug interdiction, drug identification, search warrants, undercover techniques, surveillance, debriefing

1

informants, and other investigative procedures. Since 1998, I have received thousands of hours of online and in-person training, which have kept me up to date on laws, trends, and investigative procedures regarding federal drug crimes. In addition to attending trainings, I have had the opportunity to search, seize, and personally observe what I have recognized to be (and what was later confirmed by drug analysis to be) different drugs, such as fentanyl, methamphetamine, and cocaine. I have conducted or participated in surveillance, undercover transactions, debriefings of informants and confidential sources, and reviews of recorded communications related to drug trafficking. I also have assisted in multiple state and federal drug-related investigations. I have drafted drug-related search and arrest warrants, and I have participated in the execution of numerous search and arrest warrants in which drugs, drug proceeds, drug paraphernalia, and drug-related electronic data were found.

3. Through my training and experience, I have become familiar with the habits, methods, practices, and procedures commonly employed by individuals engaged in drug trafficking, including their use of cellular telephones, social media services, and messaging applications to communicate with each other during and in furtherance of drug-related crimes.

4. I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of one cellular telephone, which is described herein and in Attachment A, and the extraction from this cellular telephone of electronically stored information, which is described herein and in Attachment B.

5.      The facts set forth in this affidavit come from my personal knowledge and observations based on my direct involvement in this investigation, my training and experience, and information relayed to me by others, including other members of law enforcement. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested warrant.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

6.      The property to be searched (the "Device") consists of one cellular telephone described and pictured below:

A black Samsung Galaxy inside of a multicolored case with a matching lanyard



The Device is currently located at the Kittery Police Department in Kittery, Maine, where the Device is connected to a charger and secured in a faraday bag in anticipation of law enforcement seeking this warrant. This warrant authorizes the forensic examination of the Device for the purpose of identifying electronically stored data described in Attachment B.

## PROBABLE CAUSE

7.      Members of the DEA's Manchester District Office, together with state and local law enforcement in both Maine and New Hampshire, have been investigating multiple suspected drug-related crimes involving Heather McGrath and other known and unknown individuals, including, but not limited to, distribution of controlled substances, possession with intent to distribute controlled substances, unlawful use of a communications facility, and conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 841, 843, and 846.

8.      Pursuant to this investigation, in February 2023, law enforcement debriefed a first confidential source ("CS-1")[1] who reported that McGrath was distributing fentanyl and methamphetamine from a particular hotel in Dover, New Hampshire. Law enforcement subsequently worked with CS-1 and an undercover law enforcement officer to complete one controlled purchase of approximately 40 grams of suspected fentanyl from McGrath in Dover, New Hampshire on about March 2, 2023, and another controlled purchase of approximately one ounce of suspected methamphetamine from McGrath in Rochester, New Hampshire, on about March 8, 2023. Subsequent field tests of the suspected fentanyl and the suspected methamphetamine purchased from McGrath in March 2023 were presumptively positive for the presence of fentanyl and

---

[1] CS-1 has a history of drug use. CS-1's criminal history includes arrests or convictions for, among other things, drug-related, vehicle-related, and fraud-related offenses. CS-1 initially was cooperating with law enforcement with the hope of receiving judicial consideration for a pending state case. No promises were made to CS-1, however. CS-1 subsequently began cooperating with DEA in exchange for monetary compensation. To date, the information provided by CS-1 has proven credible and reliable.

4

methamphetamine respectively. To date, formal laboratory testing has not been completed.

9. Several months later, on about December 11, 2023, law enforcement worked with a second confidential source ("CS-2")[2] to complete a third controlled purchase of approximately 10 grams of suspected fentanyl from McGrath in Newington, New Hampshire. A subsequent field test of the suspected fentanyl purchased from McGrath in December 2023 was presumptively positive for the presence of fentanyl. To date, formal laboratory testing has not been completed.

10. On about January 23, 2024, multiple sources of information reported that McGrath, who was known as a drug distributor in New Hampshire and Maine, was currently residing in various inns and motels in and around Kittery, Maine. Multiple sources of information also identified McGrath's most recent guest rooms at two different locations in Kittery, Maine, as places that McGrath was using to engage in ongoing drug-related crimes. Additionally, a third confidential source ("CS-3")[3] advised that McGrath also rented a storage unit in Dover, New Hampshire, where McGrath was storing large quantities of suspected fentanyl and suspected methamphetamine, which CS-3 personally had observed earlier that day.

---

[2] CS-2 has a history of drug use. CS-2's criminal history includes arrests or convictions for, among other things, drug-related as well as domestic violence-related offenses. CS-2 initially was cooperating with law enforcement after having been identified by law enforcement as part a pending state drug investigation involving an overdose death. No promises were made to CS-2, however. While law enforcement has not worked with CS-2 since the third controlled purchase described herein, law enforcement was able to corroborate the information provided by CS-2.

[3] CS-3 has a history of drug use. CS-3's criminal history includes arrests or convictions for, among other things, drug-related, vehicle-related, and firearms-related offenses. CS-3 was cooperating with law enforcement with the hope of receiving judicial consideration for a pending state case. Following the incident described herein, CS-3 has continued to cooperate with law enforcement, and the information provided by CS-3 has proven credible and reliable to date.

11. Later that day, law enforcement confirmed that there was an active state arrest warrant for McGrath related to state drug-related charges in New Hampshire, which authorized full extradition. Law enforcement also established surveillance in the area around a specific inn in Kittery, Maine, where McGrath was staying. Shortly thereafter, law enforcement observed McGrath, who was carrying three bags with her, exit the inn and enter the back seat of a vehicle with New Hampshire registration plates. The vehicle in which McGrath was an occupant then departed from the inn in Kittery, Maine.

12. Law enforcement maintained surveillance on the vehicle with New Hampshire registration plates as it entered the parking area for a motel in Kittery, Maine, at which point law enforcement initiated a stop to arrest McGrath. Following McGrath's arrest, her three bags were secured pending issuance of a state search warrant in Maine, as was one of her guest rooms. McGrath's storage unit also was secured pending issuance of a state search warrant in New Hampshire. The Device, which was recovered from McGrath following her arrest, was secured by law enforcement as well.

13. Pursuant to the execution of the state search warrant in Maine for McGrath's bags, law enforcement recovered—across multiple containers—a total of 320 grams of confirmed fentanyl, 38 grams of confirmed cocaine, 31.71 grams of confirmed pure methamphetamine, and numerous items related to processing, packaging, and selling drugs. Pursuant to the execution of the state search warrant in Maine for McGrath's guest room, law enforcement recovered, among other things, small plastic bags typically used by drug traffickers to package drugs for further distribution as well as a handgun magazine with ammunition. Further, pursuant to the execution of the state

search warrant in New Hampshire for McGrath's storage unit, law enforcement recovered, among other things, a total of 616 grams of confirmed fentanyl.

14. During a post-*Miranda* interview that occurred on about January 30, 2024, McGrath acknowledged that the bags in her possession at the time of her arrest contained fentanyl, cocaine, and methamphetamine and that her storage unit also contained a large quantity of fentanyl. McGrath also admitted that she had multiple sources of supply in New Hampshire and Massachusetts from whom she regularly purchased additional quantities of fentanyl, cocaine, and methamphetamine.

15. Based on my direct involvement in this investigation, I know that the Device was seized by law enforcement pending issuance of this warrant. Based on my direct involvement in this investigation, I also know that the Device presently is located at the Kittery Police Department in Kittery, Maine, where the Device is connected to a charger and secured in a faraday bag in anticipation of law enforcement seeking this warrant. Additionally, based on my training and experience as well as my direct involvement in this investigation, there is probable cause to believe that the Device contains evidence of drug-related crimes involving Heather McGrath and other known and unknown individuals, including, but not limited to, distribution of controlled substances, possession with intent to distribute controlled substances, unlawful use of a communications facility, and conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 841, 843, and 846.

**TECHNICAL TERMS**

16. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the global positioning system to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless

communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

17. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on cellular telephones of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the Device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

18. Based on my training, experience, and research, I know that electronic devices such as cellular telephones can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on electronic devices. This information can sometimes be recovered with forensics tools.

19. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the electronic device was used, the purpose of its use, who used it, and

when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

      a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.

      b.    Forensic evidence on an electronic device also can indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.    Further, in finding evidence of how an electronic device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

20.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

21.   *Manner of execution.* Because this warrant seeks permission to examine one cellular telephone that is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

22.   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device as described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

David H. McGuckin

David McGuckin, Special Agent
U.S. Drug Enforcement Administration

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date: Mar 12 2024

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title